May it please the Court, Doug Northup with Fenimore Craig representing the Meritage Entities. I would like to reserve five minutes of my time for rebuttal, if I may, Your Honor. The trial court lacked subject matter jurisdiction under Article III, and this case became moot in 2011 when J.P. Morgan was paid every penny it sought and every penny it could recover from Meritage in a repayment guarantee action. The controlling builders who are not before this Court own and are developing the land Meritage tried to acquire through the transaction and now want Meritage to pay for it. Because the Court cannot order any relief that would benefit the only plaintiff in this action, J.P. Morgan, through its sub-agent, ISG, the case is moot. Dismissing this case, Your Honors, does not give Meritage a free pass by any means. This would simply put the dispute in the proper forum of pending arbitration with the proper parties, Meritage and the controlling builders, and would not allow the builders to contrive and try to create subject matter jurisdiction where it otherwise does not exist. The Court should dismiss this case as moot and allow the parties to hear their grievances against one another in the pending arbitration. It is undisputed that neither J.P. Morgan nor its sub-agent will get one penny of any judgment in this case from Meritage. They have paid everything they sought, and the testimony of J.P. Morgan's lawyer at the oral argument before Judge Pro, a gentleman named Jim Huff, made that clear. The lenders have been paid, and the only beneficiaries are the builders. The bankruptcy plan, and one of the things, Your Honor, I'm sure that Mr. Schaffer will say to you something along the lines, well, the bankruptcy plan already dealt with this. First, of course, we know that an Article I bankruptcy court cannot create jurisdiction in an Article III court like this one. But as Judge Pro, even in his orders on summary judgment, stated, with respect to the treatment of the Meritage repayment guarantee, the Court held the bankruptcy court properly resolved the issue within its exclusive jurisdiction. The impact of the plan confirmation on Meritage's repayment guarantee under bankruptcy law, and left for another forum to resolve the impact, if any, on the plan transactions on Meritage's repayment guarantee under applicable State law. But the plan, Your Honor, Section 3.4.f, made it clear that the settling builders, who are not before this Court, shall pay into an escrow account an amount equal to the portion of the settling builder's consideration under the plan that is equal to the amount of the Meritage repayment guarantee liability. And as Mr. Austin, who negotiated the plan for J.P. Morgan, testified, and we've quoted this extensively in the briefing, J.P. Morgan and the lenders were paid. Every one of them took their money out of the escrow, and they are finished with this case. We know, Your Honor, there have been numerous cases cited in Balint and the other ones that make it clear that a case is moot if there's no possible relief which the Court could order that would benefit the party seeking it. And that's exactly the case here. And I think it's telling, Your Honor. The only case that was cited for this proposition that J.P. Morgan, through its subagent, retained standing was a Sprint case from the United States Supreme Court. But the issue, as the U.S. Supreme Court stated there at page 2536 of the Supreme Court Reporter, we have discovered that history and precedent are clear on the question before us. Assignees of a claim, including assignees for collection, have long been permitted to bring suit. It's undisputed here, Your Honors. First of all, the builders wanted J.P. Morgan just to not get paid on the meritage repayment guarantee and pursue that outside the bankruptcy, and J.P. Morgan said no. We know, and it's undisputed, that the builders wanted an assignment of the J.P. Morgan guarantee, and J.P. Morgan said no. They had the leverage to demand payment of all of the guarantees, and that's exactly what happened. So the district court concluded that, in fact, J.P. Morgan had not been made whole, that, in fact, that there were $47 million deficiency. Tell me why you think the district court was wrong. Well, first of all, Your Honor, under the plan, section 3.5c, it states, each holder of an allowed prepetition lender deficiency claim shall receive in full and complete settlement, release, and discharge of such claim vis-a-vis the estate and its assets a rateable share of $500,000 to be funded from the settling builder's total plan contribution. So the deficiency was paid. But even more important, Your Honor, the deficiency was a matter between the borrower, Southedge, and the lenders. That deficiency, to an extent, existed was on the loan, which ultimately was paid off. This is a suit on Meritage's repayment guarantee, and under 3.4f of the plan, the lenders were paid the entirety of the Meritage guarantee liability. And that's why I said J.P. Morgan and the lenders were paid every penny, not only that they sought in the repayment guarantee, but that they could have recovered from Meritage. So, unfortunately, Judge Breau, when he based his decision that there was standing, did so on that erroneous proposition. And for those two reasons, Your Honor, the deficiency is actually, we believe, quite irrelevant here. So you agree there is a deficiency, you just don't think it's structurally relevant to this litigation? No, Your Honor. The deficiency was paid. Under that section of the plan that I just read to you. Well, the plan says it was. Judge Breau says it wasn't. Pardon me? I mean, the plan says that the obligations were satisfied. But we all know that in confirmation of bankruptcy plans, sometimes that's not entirely accurate given the complexity of transactions. And that's what I think Judge Breau is getting at here. I suppose, except the problem with that is there isn't ever going to be any money that can go to J.P. Morgan. I mean, if there's a deficiency and J.P. Morgan had the ability to collect that But as Mr. Austin said, the builders or the lenders are done with the case. The lawyers that are arguing this case, Mr. Schaefer has never represented J.P. Morgan and he couldn't. J.P. Morgan could care less about this as well as the lenders because they've all been paid everything that they ever will be paid. And our point again is let this case be heard where it should be, not under contrived jurisdiction that doesn't exist in Federal court and under a repayment guarantee trying to take the benefits of the repayment guarantee by a party who could not and did not get an assignment of the rights there. So explain to me the status of the arbitration. I'm sorry? Explain to me the status of the arbitration. The arbitration was initiated by the builders. There were counterclaims that were asserted. And then the builders filed a motion to stay the arbitration. And we've quoted from it fairly extensively where they said, panel, stay this before you is before the district court and now the Ninth Circuit Court of Appeals. And that's our point. We're more than welcome to take the challenge to litigate meritage's claims and defenses against the builders who are the ones that paid its guarantee liability, but there simply isn't jurisdiction in this court because the party who's trying to pursue the claim is fully paid. And, Your Honor, another issue that there's been. And your answer will make no difference. Is this claim settlable? Is it settlable? Yeah. The reason I ask is that occasionally when we have some of these types of commercial disputes, that our circuit mediators do a pretty good job, even though of bringing people who aren't necessarily parties to the instant litigation and trying to reach a global settlement. Is that of interest to you? Well, I mean, this case, Your Honor, where it is now as a dispute between the builders and meritage would be settlable. What's made that difficult is the fact that meritage was forced to pay its entire repayment guarantee liability plus attorney's fees plus default and other types of interest, and the builders have meritage's property that it tried to take down. So what they're looking for now is for meritage to pay for the land that they own and are developing. But is it settlable? I mean, I think any case is settlable, but it hasn't — there have been attempts made and discussions made, and the parties just haven't been able to resolve it, largely because of the issues we're talking about today. One other point, Your Honor. There's some discussion in the case about, well, what really happened in the case was that there were participation interests sold in the repayment guarantee. And there's a couple of things on that. First of all, the guarantee was assignable, but it did not allow participation interests to be sold in the guarantee. The assignment provision under Section 16 allows participation interests in the facilities, which are defined in the first whereas clause in the guarantee, which include the loan. But that first whereas clause defines facility documents to include the repayment guarantee. So by its terms, and these under New York law, Your Honor, have to be strictly construed in favor of the guarantor, there cannot be a sale of participation interests in the guarantee. And, of course, there couldn't be sales of participation interests in the loan in the bankruptcy because the loan was paid off. But one important point. Even if participation interests could somehow be sold, the proper party, the real party in interest there would be the transferee, the builders. It wouldn't be the party who's been fully paid and even under their argument transferred those claims. So we think for all these reasons Judge Proulx lacked subject matter jurisdiction and the court should be dismissed for that reason. We've made other arguments, Your Honor, that I think are fairly well fleshed out about Section 2B termination under the repayment guarantee. One thing that is important there, Judge Proulx determined that the termination did not occur because the money wasn't paid directly to J.P. Morgan. But, of course, that's not the case because under J.P. Morgan's own loan documents the money had to be paid into an escrow as it was in 2007 when Meritage and the other parties successfully took down their property. And the law of tender here really isn't disputed. Meritage made every opportunity. J.P. Morgan was going to get all of its money out of the escrow. It was earmarked directly for J.P. Morgan. So under Section 2B the guarantee terminated. The same under 2C. And one of the real issues here is when that guarantee terminated, Meritage had subrogation rights. Meritage should have at least been able to get the property that it's paying so far it has paid for, but under the plan that's not the way it would happen. So we've made our argument under 5B of the assignment of the acquisition agreement. I see I'm beyond what I've already kept for rebuttal. I'm happy to answer any questions that Your Honors might have, but we would ask that you dismiss this case. Thank you, counsel. Good morning. John Schaeffer for ISG, subagent for J.P. Morgan. May it please the Court. Before I get into the merits of things, I think it's very important that the Court understand the legal relationship between the different parties in the case, because I believe Meritage attempts to conflate the different roles of J.P. Morgan and the agent. Under the credit agreement, J.P. Morgan is the administrative agent. ISG, who I represent, is a subagent of J.P. Morgan, and we are standing in its shoes. J.P. Morgan, as administrative agent, is responsible for enforcing all rights under the credit agreement. That's set forth in Section 10.01, and it's set forth in the guarantee itself. If you look at the guarantee starting at E.R. 81, you'll see that the guarantee, demand under the guarantee, suit under the guarantee, payment under the guarantee is all made to J.P. Morgan. What J.P. Morgan then does under the credit agreement pursuant to Section 2.10 is distribute that money off to the lenders. The real party in interest here is and always was J.P. Morgan as administrative agent. As Justice Breyer recognized in the Sprint case, the courts have always recognized that parties in a representative capacity, receivers, assignees for the benefit of creditors, indentured trustees, and here administrative agents, are the real parties in interest in litigation regardless of where the proceeds ultimately go. Here, J.P. Morgan ISG would collect and intends to collect from Meritage. What it does with the money afterwards, Justice Breyer quite clearly told us, and Chief Justice Roberts agreed, is really irrelevant. The money gets distributed pursuant to the credit agreement. Now, what happened under the South Edge plan was pursuant to Section 3.4 of that the lenders, not J.P. Morgan, because J.P. Morgan didn't assign anything, the lenders assigned their right to receive money from J.P. Morgan to the builders who settled pursuant to the plan of reorganization. So prior to the confirmation of the plan, the way this litigation would have worked is that J.P. Morgan sued Meritage. Meritage would have to pay J.P. Morgan. J.P. Morgan would distribute the money pursuant to the lender participants, and at times there were more than 100 of them. As a result of the plan, all that has changed is that when J.P. Morgan ISG received the money, it will distribute it pursuant to the instructions of the lender participants. And those instructions pursuant to the plan were to distribute it to the builders who paid over $300 million in connection with the bankruptcy settlement. That's all that's changed here. And the Sprint case makes absolutely clear that the fact that the proceeds may be going to someone else now does not change the legal standing of the party with legal title. And the party with legal title is J.P. Morgan ISG. But I just want to get a clarification there, because I think you're talking about the escrow agreement within the restructuring plan, correct? Yes. Okay. So you have the escrow agreement, the money goes from the settling builders into this, and then the lenders can assign out, correct? Yes. Okay. So if they do that and the lenders get their pro rata share, why doesn't J.P. Morgan, in effect, in that same position, that in effect its case against Meritage is moot as a result of that transaction? Well, a couple of reasons, Your Honor. First of all, if Judge Reinhardt gave you an IOU, I don't know if he'd be inclined to do such a thing, but if he did for $100 and you chose to, independent of that agreement, for whatever reason, say, whenever Judge Reinhardt pays me, I'll pay you the $100, maybe I did a favor for you, that wouldn't change in any respect whatsoever the legal relationship between you and Judge Reinhardt. You would still be the party that can enforce the note. And in this case, the you is J.P. Morgan. But if I recover the money? But it's not, it's, a debt doesn't go away just because the original creditor sells the loan. Right. The borrower doesn't go, oh, geez, this is great. No, but you have an intervening bankruptcy. Yeah, in this case, it's a different relationship given the restructuring plans. I don't think it's a straight one-to-one IOU from A to B, and then I still, of course, have my legal claim against the original maker of the IOU. But in this case, with the interrelation among the parties, it just seems to me that the lenders, including J.P. Morgan, potentially, and then it's Agent, as you laid out, that they really, in effect, have recovered the money owed. Well, the lenders received consideration for their assignment in an amount, and it wasn't actually equal to the meritage guarantee. And as Judge Thomas noticed, it was still a $47 million deficiency on the total loan. And a large chunk of that is because of other builders who didn't pay. Right. But it's important to note that J.P. Morgan and ISG aren't out of the case. There were still administrative duties for J.P. Morgan to perform under the credit agreement. At the time the deal was signed, there were still indemnification rights and other litigation that needed to be resolved. J.P. Morgan doesn't have to be a lender in order to be the administrative agent. J.P. Morgan's role, in the same way that a trustee generally isn't and probably, in fact, shouldn't be the beneficiary of a trust, and yet there's no question that a trustee is the one who has authority to speak for and to sue on behalf of the trust. J.P. Morgan and ISG are essentially assuming that role here, and they've continued that role throughout the case. J.P. Morgan, as Meritage's counsel made clear, J.P. Morgan did not assign its own rights as administrative agent. It refused to do so, and frankly, it would be imprudent to do so. So J.P. Morgan and ISG are still in the case. I still deal with J.P. Morgan's counsel because they are the ultimate agent here. I represent the subagent. And we are now collecting this pursuant to the instructions of our lender participants. But they have instructed us to distribute the money to the settling builders because that was their deal. Well, that was the deal in the restructuring plan, right? That was the deal under the restructuring plan. That's been done? And that has been done. It was done in 2011. And just to make things clear, because I know the issue of settlement came up, the exact same deal that the four – South Edge had eight members. Two of them, unfortunately, went bankrupt themselves. One of them actually had done all of its land purchases before the real estate crashed. But of the five remaining members, four of them, the settling builders, entered into a settlement agreement with the city of Henderson, with the bankruptcy trustee, with J.P. Morgan. And as part of that deal, they agreed to pay $330 million to bring South Edge out of bankruptcy. And part of that deal was honoring their own repayment guarantees. Meritage, for a period of six months during the bankruptcy, was offered the exact same deal. And, in fact, I stood personally at the confirmation hearing and put it on the record in the bankruptcy court that Meritage still, until the close of that day, had the opportunity to take the exact same deal as the four other members. And Meritage declined. Meritage's stated reasons was that it was different because it thought it was off the hook based upon some transactions that had occurred in April of 2008, which I'd be happy to get into. So we've had plenty of opportunity to settle this, and Meritage has had the opportunity to settle on the exact same terms as the other four builders. I think it would be very unpalatable to have Meritage get a better treatment than the other four builders got. You're up. Well, in a sense, the way I understand the party's difference as to the effect of the confirmation of the bankruptcy plan, which would be raised judicata, is that you believe that this action was expressly excluded from the plan and the rights of J.P. Morgan as administrator were preserved as to pursuit of this action. Their position is, I think, that the bankruptcy plan extinguished the debt. And, yes, that is their position, Your Honor, and that's incorrect because the section 3.5 that Mr. Northrup was quoting makes very clear that the release of the deficiency was vis-a-vis the bankruptcy estate. It was not vis-a-vis other guarantors. And, in fact, there were three other guarantors, one of them being Meritage and the other two were the bankrupt guarantors who have their own bankruptcy estates. There was no release vis-a-vis guarantors other than the guarantors who actually ponied up the $300 million to settle the case. The bankruptcy judge's confirmation order makes that absolutely clear at S.E.R. 34 and 35, that there was no release of anyone other than the debtor. And Ninth Circuit authority makes that clear, too, because when debtors get a discharge in bankruptcy, third-party guarantors do not get a release. That's what the American hardwoods in the Underhill v. Royal cases say. Meritage did not get a free pass just because Southedge went through bankruptcy. Your Honor, Meritage cites various other evidence to try to get around the plain language of the plan. For example, they cite one particular section, 8.7. But what that section of the plan provides is that the settling builders, the four who actually paid the $330 million to settle the case, were getting releases. They try to hang on one single sentence at the end or phrase at the end of that clause that says, in full satisfaction of the repayment guarantees. But you have to look at the plan as a whole document. And as a whole document, it's absolutely clear when you look at Section 3.4, when you look at the confirmation order, that the intention of the parties was not to have a satisfaction of Meritage's debt, but rather to have an assignment of that debt from the lenders to the settling builders so that the settling builders would take the risk of collection. If they collected, they'd be made whole. If they didn't, then it was their risk. And that's what the plan did. Your Honor, I'd like to briefly talk about some of Meritage's other arguments. They make the contention that they attempted to tender for their liability in April of 2008. But if you look at the terms of their own tender, and in particular their escrow instructions, which are in our excerpts of record, you'll see that the terms of the tender were not in compliant with the credit agreement. Meritage demanded a release of J.P. Morgan's liens upon the property at a time when Southedge was already in material default. And that default was the result of defaults by all of the builders, including Meritage, as found by an arbitration panel. Southedge had missed interest payments, and as a consequence, J.P. Morgan, under 7.03 of the credit agreement, had a legal right not to release its liens on the collateral. And it had good reasons, as found by Judge Pro based upon the undisputed evidence in the record, which is that J.P. Morgan, the lender, the agent, excuse me, for 125 lenders on a $585 million loan, secured by 2,000 acres of real estate in Nevada, didn't want to have a balkanization of the property and have one-off settlements with different builders. Meritage's property was about 41 acres. This was an integrated master plan development where streets would run into streets and sewers would run into sewers, and J.P. Morgan would not agree to release its lien. And it wasn't required to. Meritage misstates Section 5B of what is called the assignment agreement. That agreement simply provides that if Southedge was normally on a, quote, unquote, takedown, these are the, this is what it would look like if Southedge was on a takedown. This was the member's agreement to purchase land from Southedge. Normally, that money would go to Southedge. But in the event of a default, J.P. Morgan had the right to demand that all of the money that would have been paid to Southedge go directly to J.P. Morgan for obvious reasons. But that didn't excuse all of the multitude of other requirements for a buyer such as Meritage to complete its takedown, including the fact that they cannot get a release of J.P. Morgan's liens if there was a material default. And there was a material default. Furthermore, the purported tender that Meritage made, if you look at page 69, their closing escrow statement, you'll see that at most only $12 million was supposed to be going to J.P. Morgan. And while that was J.P. Morgan's release price, 5b, the section of the assignment agreement, the section they rely upon, makes absolutely clear that the entire takedown proceeds had to go to J.P. Morgan. And if you look at ER69, you will see that the entire takedown price was over $29 million, and at most Meritage was only allotting $12 million to J.P. Morgan. And frankly, Judge Proe even questioned that, because if you look at the escrow instructions, it says all payments to Seller, South Edge, not to J.P. Morgan. Your Honor, I see I'm out of time, essentially, so unless there are any other questions. Roberts. Any further? Thank you, Justice. Thank you very much. The Builders have cited to you no case where a party that owned a claim and has been fully paid on that claim has been held to have standing to continue to maintain it. What counsel said about J.P. Morgan remaining on as administrative agent was, I think, frankly, a little misleading, because J.P. Morgan was a lender. It was one of the major lenders. It was the administrative agent. But it is undisputed, and you did not hear counsel state, that all of the lenders were not paid everything under the repayment guarantee. They were. Now, if J.P. Morgan or ISG wanted to remain on the case as a Builders agent and take some actions because they had some kind of an assignment or something like that where they're the ones that have paid it, that might be a different circumstance. But you're suggesting that his statement that they remain on with administrative duties, including indemnification and other oversight duties, is not sufficient for standing if, in fact, they've been paid? Not at all, Your Honor, because J.P. Morgan came on as administrative agent, but it was one of the major lenders. They've been paid. And as the 3.4 says, and this is critical under the plan, the repayment guarantee, Meritage's repayment guarantee liability was fully satisfied. And think about the jurisprudence that would be in a circumstance like this. Somebody is owed money, and they are fully paid. No question. They don't get another penny. Yet they can contrive a scheme under which they get to stay on as a plaintiff so that the court retains Federal jurisdiction. That simply flies in the face of all of the case law. And in the, as you'll recall, in the Sprint case, that was a 5-4 decision where Justice Roberts vigorously dissented about whether persons who even had an assignment had standing. But those folks had an assignment, and it's undisputed here, there was no assignment. These are simply, Your Honor, legal machinations that if this is allowed to maintain standing, I mean, a party could go out and say, well, I don't have diversity jurisdiction. I'm going to go pay somebody to pursue my claim for me, even though they don't have an interest in it, and get diversity jurisdiction. I mean, we're talking about the court's jurisdiction, and we're not talking about Meritage getting off scot-free. I mean, what counsel said about the settlements and that, I'm not going to get into all that because I don't think it's appropriate. Sure, we could have gotten on the plan under terms that were completely unacceptable, and Meritage has many defenses that it is eager to be able to bring against the proper parties, the builders, but hasn't been allowed to under the situation that was created here. And the bankruptcy plan, Your Honors, is not res judicata or anything of the kind. The bankruptcy plan is nothing more than a contract between the debtor and the creditors. Well, no, it is res judicata as to the issues as decided. Correct. Black-letter law. But as Judges both Pro and Markelbo said, the bankruptcy plan did not even purport to, and I think Judge Markel said it didn't have jurisdiction to decide whether the planned transactions either helped Meritage or hurt Meritage in the repayment guarantee action. That was going to have to be decided in another forum. And the other forum is, we would respectfully submit the arbitration, but it certainly was not the bankruptcy. So for all these reasons, Your Honors, I won't, unless you have further questions on the mootness issue, I'm just about out of time. I did want to make a point on the Section 5B. Meritage was a 3.5% owner. It tried to do its takedown. It voted to pay interest, so there wasn't even a default. 5B of the assignment to the acquisition agreement was the out for the smaller members. You could take down your property, but if J.P. Morgan never demanded, and if it had, Meritage would have done so. All it wanted was its property. I'm happy to answer any questions, and we appreciate your time. Thank you, Your Honors. Thank you both for your arguments today. The case you just heard will be submitted for decision.
judges: Thomas, Reinhardt, McKeown